Rogers *v.* Moody, Appellant.

Argued April 23, 1968.   Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

*William B. Freilich,* with him *Joseph G. Manta, James M. Marsh,* and *LaBrum and Doak,* for appellant.

*David N. Rosen,* with him *Rosen, Sherwin, and Seltzer,* for appellee.

OPINION BY MR. JUSTICE MUSMANNO, May 21, 1968:
On May 20, 1961, Ralph Rogers, 20 years of age, was seriously injured when the automobile in which he

was riding and which was being driven by Robert Mac-
Millan, came into collision with an automobile being
operated by Dwight Moody at the intersection of Hunt-
ing Park Avenue and Clarissa Street in Philadelphia.
In the ensuing lawsuit, the jury returned a verdict in
favor of Ralph Rogers in the sum of $65,000, which was
reduced by order of the Court, through the process of
remittitur, to $40,000.*

The defendant Moody asks for a new trial, contend-
ing that the verdict was against the weight of the evi-
dence and that the amount of the verdict, even after
the reduction, was excessive. No point will be served
in a long discussion of the evidence adduced at the
trial. Briefly stated, the accident happened in the
following manner.

The MacMillan car stopped for gasoline at a gaso-
line station at the corner of Hunting Park Avenue and
Clarissa Street, and then started out to turn left to
enter into Clarissa Street, to proceed in a northward-
ly direction on that thoroughfare. After momentarily
halting so that a taxicab which was blocking MacMil-
lan's way could back up to allow MacMillan passage,
MacMillan looked to the left and saw no cars approach-
ing, his view extending some 200 feet; he then looked
to the right and saw no northbound traffic coming
from this direction. When he looked to the left again
the Moody car was headed directly for him on his,
Moody's, wrong side of the road. The evidence sup-
ports the conclusion that Moody, moving in the line
of the Clarissa Street traffic, impatient with waiting
for the cars ahead of him to turn right onto Hunting
Park Avenue, drove around them. In so doing, he was

---

* The defendant brought in Howard MacMillan, owner of the
car in which the plaintiff was riding, and Robert MacMillan, its
driver, as additional defendants, but they do not figure in the
appeal, and, therefore, their irrelevant roles will not be discussed.

"bucking traffic," and consequently moved rapidly so as to regain his right side of the highway as quickly as possible. While executing this flanking movement the MacMillan car appeared ahead of him. Moody now was traveling at such a speed that he could not stop instantly and he had nowhere to turn. The inevitable collision followed.

The defendant denies he was traveling at an excessive rate of speed and claims he was not moving in excess of 20 to 25 miles per hour. He maintains that the collision occurred because MacMillan suddenly turned into his path as he exited from Hunting Park Avenue.

The issue was strictly one of fact and could only be resolved by assessing the credibility of the involved witnesses. Our study of the record convinces us that the lower court did not abuse its discretion in refusing a new trial on the ground that the verdict was against the weight of the evidence.

The verdict as reduced, and even perhaps before reduction, was not excessive when one reflects on the gravity of the plaintiff's injuries. When the Moody car struck the MacMillan car, the resulting impact was of such violence that the plaintiff's head crashed through the windshield, the breaking glass becoming knives to slash his face, and cut through bone and cartilage. The lower court described the plaintiff's injuries in the following language: "Multiple lacerations of the face, laceration of the carotid gland (the salivary gland), and multiple fractures of the nasal bone and right maxilla (right cheek-bone). His facial lacerations caused him to lose a substantial amount of blood (approximately 1 pint) and they were described by a surgeon-witness as follows: a laceration from the bridge of the nose, across the right cheek to a point just below the right ear; (17 centimeters in length); a lacera-

tion of the salivary gland; a cut of the right upper lip, 2.2 centimeters in length, and lacerations on the right and left forehead, 4.8 and 2.8 centimeters in length, respectively. The plaintiff also sustained a facial 'tic' to the right side of his face, permanent scarring of the face and a dorsal 'lump' deformity of the nose bone, caused by residually displaced bone fragments. This nose deformity has caused the plaintiff to suffer pain from the pressure and the weight of his eyeglasses, which rest upon the injured area."

His financial losses resulting from his injuries were summarized by the court below: "Temple University Hospital $394.00; National Biscuit Co., lost earnings (3 weeks) 266.40; Future plastic surgery to repair facial scarring and deformity, including hospitalization, 2,290.00; Future lost earnings re: future plastic surgery, at November, 1966, rate of pay 508.80; Total $3,459.20."

Photographs of the plaintiff introduced at the trial show that the plaintiff has suffered a grave disfigurement. For the rest of his life he will, in the most literal sense of the word, be identified as the man with the scarred face. Even though, as the defendant urges, young Roger's disfigurement may be lessened in degree through plastic surgery, there is always the possibility that surgery might aggravate, instead of ameliorate the mutilation. There have been too many instances of attempted plastic correction which turned a minor facial blemish into a mask of grotesqueness to save a candidate for plastic correction from the fear that the scalpel might, instead of restoring to him even features, turn him into a Pariah in society.

A verdict of $40,000 for out-of-pocket financial loss, plus future expenses, plus potential loss of earning power, plus pain and inconvenience, is not an excessive amount as against what the plaintiff must from

now on confront in life. More and more, good physical appearance is becoming an asset in the social, economic, business and professional world.

Advertisements of all kinds appear in periodicals and on radio and television, offering fashionable raiment, colorful haberdashery, perfumed shaving creams, fragrant bath salts, and Arabian lotions, all designed to make the male animal more attractive to women in particular and to the world in general. Indeed the empire of beautification heretofore ruled by and for women alone is now under invasion by manufacturers, merchants and cosmetic tycoons in behalf of men. "Image" has become the shibboleth not only of show people, politicians, and public relations executives but of lawyers, doctors and Indian chiefs.

It can no longer be doubted that professional sartorial and tonsorial attention can and does assist men in enhancing their image and status in society, but very little can be done to improve the appearance of a countenance criss-crossed with scars. The most that ugly scars can gain for their wearer is pity, which can only add to a reflective person's pain. If the deformity is serious enough, it can change the character and the personality of a man, driving him into a state of inferiority complex.

Particularly could this be true in the case at bar where, as the evidence indicates, the severed muscles in the plaintiff's face have inflicted him with a tic. One of the doctors at the trial testified: "The major difficulty this patient presents is the extensive scarring of the face with a tic of the face. The tic itself accentuates the scar because it brings the patient's face more to the attention of someone else. . . . Be that as it may, the facial tic is definitely related to his injury in that without the scar on his face, due to the accident, no tic would be evident. I do not feel that this

126

tic will disappear.   He will, I believe, have it for the rest of his life."

Thus the scars magnify the prominence of the tic, and the tic, like a flashing neon sign, calls the attention of the passing world to the victim, impaled on the spear of an unwanted miserable conspicuousness.

A man's face is a lamp in which glows the wick of graciousness and friendly appeal, fueled by the spirit within.   This lamp can illumine his path to the fulfillment of his aspirations when tended by the virtues of sincerity and conscientious endeavor.   But if the globe of the lamp is broken, the flame suffers from all the winds of unkindness blown by those who are too preoccupied with their own affairs to extend a sympathetic hand to the man who has been doomed to walk for the rest of his days in semi-darkness.

Disfigurement is a disablement as much an item of damages as a broken leg.   Therefore, a jury is required to evaluate it as an objective loss, instead of allowing only a nominal sum as a weak salve to poultice an injured feeling.

The defendant asserts many times over in his brief that the verdict was based on "passion and prejudice," but he does not point to a single line in the record to substantiate this charge.   Nor do we find the slightest suggestion in the record of appeal to "passion and prejudice" by counsel in the case.

Judgment affirmed.

Mr. Justice JONES, Mr. Justice COHEN and Mr. Justice ROBERTS concur in the result.